Filed 5/18/16  P. v. Puterbaugh CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>BRANDON ROBERT PUTERBAUGH,<br><br>    Defendant and Appellant. | F068625<br><br>(Super. Ct. No. RF006579A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Kenneth G. Pritchard, Judge.

Hassan Gorguinpour, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Robert Gezi, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury convicted Brandon Robert Puterbaugh (Puterbaugh) of assault by means of force likely to produce great bodily injury (Pen. Code,[1] § 245, subd. (a)(4); count 2) and

---

[1]All statutory references are to the Penal Code unless otherwise stated.

false imprisonment by violence or menace (§ 237; count 3).[2] He was sentenced to a total of two years eight months in prison and now appeals. We hold (1) the conviction on count 2 must be reversed for failure to instruct on simple assault as a lesser-included offense, but (2) Puterbaugh is not entitled to a new trial based on juror misconduct.

## *FACTS AND PROCEDURAL HISTORY*

On March 2, 2013, Julie Gilbert took food and other items to Puterbaugh, her adult son, at his residence, a mobile home on approximately 20 acres between Inyokern and Lake Isabella, in Kern County.[3] Gilbert lived there part time with Puterbaugh.

Gilbert decided to leave around 9:00 a.m. on March 5. Puterbaugh followed her to her truck, grabbed her arm to try to stop her from getting to the vehicle, and then took the keys from her hand when she went to start the truck. Gilbert got her spare set of keys out of her purse, but Puterbaugh reached in through the vehicle window, grabbed Gilbert's hand and then her arms and, after they "wrestled for about an hour," took the keys away from her. During this time, Puterbaugh constantly told Gilbert that she was not leaving in his vehicle and to give him the keys. Eventually, he pulled her out of the vehicle.

Puterbaugh took Gilbert into the trailer and had her sit on the bed. He said the truck was not her vehicle and started insisting she was not his mother. Puterbaugh sat blocking Gilbert's way to the door and did not allow her to go anywhere. When she had to go to the bathroom, he followed her and stood outside the door.

From approximately 10:00 a.m. to 4:00 p.m. on March 5, Gilbert and Puterbaugh had an on-and-off argument about her not being his mother and "stuff going through his head." At times, Puterbaugh grabbed Gilbert's hair and pulled it up from the back. He said he was going to take the mask off. Whenever she tried to convince him that she was

---

[2]Count 1, which charged Puterbaugh with first degree burglary (§ 460, subd. (a)), was dismissed during trial.

[3]Undesignated dates throughout this opinion are to the year 2013.

2.

his mother, he hit her and told her she was not. He hit her multiple times. He hit her on the head, and, when she curled up to try to protect herself, he hit her on the back with "[k]idney-shots-type hitting." She received a bruise on her temple and lumps all over her head, and "[j]ust aches and pains and soreness from being hit." She believed that at times—including when he struck her near her left temple—Puterbaugh hit her as hard as he could, but at other times, she felt he pulled his punches.[4]

Gilbert looked at the clock around 4:00 p.m. That was the last thing she recalled until the next morning. It was after a physical altercation, and she did not know if she just went to sleep or passed out or was knocked out.[5] The next thing she remembered was waking up at 6:00 the next morning. Puterbaugh was sleeping on the bed next to her, and she left. So Puterbaugh would not be able to see her, she snuck through the bushes, went down the wash and up the neighbor's driveway, and out to State Route 178. She did not ask for help at the neighbor's house because it was early and she just wanted to get away from there.

Once at the highway, Gilbert began walking. She passed a second house then was able to flag down a passing motorist who took her to a service station in Inyokern.[6] From there, she called the sheriff's department.

Kern County Sheriff's Deputy Clodt was dispatched to the service station at approximately 8:00 a.m. When he came in contact with Gilbert, he observed she was very upset and the right side of her face was swollen. Gilbert told him about the incident, and he took her to the sheriff's substation to photograph her injuries. Gilbert had bruising

---

[4]Gilbert previously had seen Puterbaugh throw punches "[a] hundred times," as he was training for mixed martial arts fighting and was a black belt in several "tae kwon do-type things."

[5]Gilbert denied being under the influence of any medication, drug, or alcohol.

[6]The motorist asked if she wanted some medical attention. She said no. She just wanted to get away.

on the right side of her face, a small amount of blood coming from her right ear, bruising on her arms, and redness just below her neck area. She told Clodt that she did not want to go to the hospital. About 2:00 that afternoon, however, Gilbert went to the emergency room. Her forearms were swollen and red, and her head and ear hurt. It turned out that the post of one of her stud earrings was broken into her ear and had to be removed.

Clodt and other officers went to the mobile home and arrested Puterbaugh around 3:00 that afternoon. Puterbaugh asked if the patrol cars the deputies brought to the location were the ones that were purchased by "Shelly." Clodt had no idea what Puterbaugh was talking about. Puterbaugh also asked when the bartender was showing up. When Clodt was transporting Puterbaugh to jail, they drove over the overpass at State Route 395. Puterbaugh informed Clodt it was Puterbaugh's road.

## DISCUSSION

### I.    Failure to instruct on lesser-included offense as to count 2

#### A.    Background

As previously stated, Puterbaugh was charged in count 2 with assault by means of force likely to produce great bodily injury. (§ 245, subd. (a)(4).) The jury was instructed on the elements of this offense pursuant to CALCRIM No. 875. In part, jurors were told the People had to prove Puterbaugh did an act that, by its nature, "would directly and probably result in the application of force to a person, and the force used was likely to produce great bodily injury." Jurors also were told: "No one needs to actually have been injured by [Puterbaugh's] act, but if someone was injured, you may consider that fact along with all the other evidence in deciding whether [Puterbaugh] committed an assault, and if so, what kind of an assault it was. [¶] Great bodily injury means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm."

The jury instruction conference was not reported. Although the trial court instructed the jury on the lesser-included offense of misdemeanor false imprisonment as

4.

to count 3, it did not instruct on simple assault (§ 240; see CALCRIM No. 915) as a lesser-included offense of count 2.

After the jurors retired to deliberate, they sent out a copy of CALCRIM No. 875, on which they had circled "an act" in point No. 1A ("[D]efendant did an act that by its nature would directly and probably result in the application of force to a person") and placed a check mark by that point and point No. 1B ("[F]orce used was likely to produce great bodily injury"). At the same time, they requested the "EXACT TEXT" of section 245, subdivision (a)(4). As a result, defense counsel asked the court to instruct on simple assault as a lesser-included offense. The court refused. Ultimately, it decided— with the agreement of both counsel—to delete the portion of CALCRIM No. 875 requiring the People to prove the absence of self-defense or defense of another, then give the jury a clean copy without the handwritten deletions and modifications that were present on the original written instruction. The clean copy was given to the jury the next morning.

The jury subsequently asked for a definition of "willfully" as used in the instruction on count 2. The court reread them the definition contained in CALCRIM No. 875.

Later that morning, the jury requested transcripts of Gilbert's and Clodt's testimonies. They also sent out a note that read, "Realizing the lack of the misdemeanor option, what is the difference between a felony assault and misdemeanor assault, if such exists?" Defense counsel again asked the court to instruct on simple assault. The prosecutor responded: "No. It's not a lesser-included. They've got a felony or nothing." The trial court denied the defense request and refused to tell the jurors misdemeanor assault existed but was not before them. Over defense objection, the court informed the jury: "The only reply I will give to you is that your job as jurors is to decide the questions that have been posed to you." With the assent of both counsel, it also told

jurors that preparing a written transcript was not an option because it would take too long, but the testimony could be reread to them.[7]

Puterbaugh now contends the jury should have been instructed on the lesser-included offense of simple assault. We agree the trial court erred by failing to give such an instruction. Under the circumstances of this case, we find the error prejudicial.

### B.    Analysis

"An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240.) "Any person who commits an assault upon the person of another by any means of force likely to produce great bodily injury" has committed a form of aggravated assault under section 245, subdivision (a)(4).

"Under California law, a lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser. [Citations.]" (*People v. Birks* (1998) 19 Cal.4th 108, 117-118, fn. omitted.) Simple assault is a lesser-included offense of aggravated assault. (*People v. McDaniel* (2008) 159 Cal.App.4th 736, 747-748.)

"A trial court must instruct the jury on a lesser[-]included offense, whether or not the defendant so requests, whenever evidence that the defendant is guilty of only the lesser offense is substantial enough to merit consideration by the jury. [Citation.] Substantial evidence in this context is that which a reasonable jury could find persuasive. [Citation.]" (*People v. Halvorsen* (2007) 42 Cal.4th 379, 414, fn. omitted.) In other words, the trial court's instructional "duty applies whenever there is evidence in the record from which a reasonable jury could conclude the defendant is guilty of the lesser, but not the greater, offense. [Citations.]" (*People v. Duff* (2014) 58 Cal.4th 527, 561.)

---

[7]Jurors subsequently sent out a note listing which portions of testimony they wished to have reread. The requested testimony was reread to them.

"This venerable instructional rule ensures that the jury may consider all supportable crimes necessarily included within the charge itself, thus encouraging the most accurate verdict permitted by the pleadings and the evidence." (*People v. Birks*, *supra*, 19 Cal.4th at p. 112.) "[T]he rule prevents either party, whether by design or inadvertence, from forcing an all-or-nothing choice between conviction of the stated offense on the one hand, or complete acquittal on the other. Hence, the rule encourages a verdict, within the charge chosen by the prosecution, that is neither 'harsher [n]or more lenient than the evidence merits.' [Citations.]" (*Id*. at p. 119.) As our state high court has explained, "'Our courts are not gambling halls but forums for the discovery of truth.' [Citation.] Truth may lie neither with the defendant's protestations of innocence nor with the prosecution's assertion that the defendant is guilty of the offense charged, but at a point between these two extremes …. A trial court's failure to inform the jury of its option to find the defendant guilty of the lesser offense … impair[s] the jury's truth-ascertainment function." (*People v. Barton* (1995) 12 Cal.4th 186, 196.)

In deciding whether a theory of a lesser-included offense finds substantial support in the evidence, a court determines only the "bare legal sufficiency," not the weight, of the evidence. (*People v. Breverman* (1998) 19 Cal.4th 142, 177.) "This does not require—or permit—the trial court to determine the credibility of witnesses. It simply frees the court from any obligation to present theories to the jury which the jury could not reasonably find to exist." (*People v. Wickersham* (1982) 32 Cal.3d 307, 324-325, disapproved on another ground in *People v. Barton*, *supra*, 12 Cal.4th at p. 201.)

An appellate court "independently review[s] a trial court's failure to instruct on a lesser[-]included offense. [Citation.]" (*People v. Cook* (2006) 39 Cal.4th 566, 596; accord, *People v. Waidla* (2000) 22 Cal.4th 690, 733.) If there is no evidence the offense committed was less than that charged, a trial court does not err by failing to instruct on a lesser offense. (*People v. Cruz* (2008) 44 Cal.4th 636, 664.) Similarly, "[s]peculation is

an insufficient basis upon which to require the trial court to give an instruction on a lesser[-]included offense." (*People v. Wilson* (1992) 3 Cal.4th 926, 942.)

The question before us "is whether a reasonable jury could have found that [Puterbaugh] committed only a simple assault and not an assault [by means of] force likely to produce great bodily injury." (*People v. McDaniel*, *supra*, 159 Cal.App.4th at p. 748.) In this regard, "[s]ection 245 'prohibits an assault by means of force *likely* to produce great bodily injury, not the use of force which does in fact produce such injury. While … the results of an assault are often highly probative of the amount of force used, they cannot be conclusive.' [Citation.] Great bodily injury is bodily injury which is significant or substantial, not insignificant, trivial or moderate. [Citations.] '"The crime …, like other assaults may be committed without the infliction of any physical injury, and even though no blow is actually struck. [Citation.] The issue, therefore, is not whether serious injury was caused, but whether the force used was such as would be likely to cause it."' [Citation.] The focus is on the force actually exerted by the defendant, not the amount of force that could have been used. [Citation.] The force likely to produce bodily injury can be found where the attack is made by use of hands or fists. [Citation.] Whether a fist used in striking a person would be likely to cause great bodily injury is to be determined by the force of the impact, the manner in which it was used and the circumstances under which the force was applied. [Citation.]" (*Id*. at pp. 748-749; accord, e.g., *People v. Aguilar* (1997) 16 Cal.4th 1023, 1028; *People v. Hahn* (1956) 147 Cal.App.2d 308, 311.) "'[T]he question of whether or not the force used was such as to have been likely to produce great bodily injury, is one of fact for the determination of the jury based on all the evidence, including but not limited to the injury inflicted. [Citations.]' [Citation.]" (*People v. Armstrong* (1992) 8 Cal.App.4th 1060, 1066.)

There can be no doubt the evidence in the present case was sufficient to sustain Puterbaugh's conviction for aggravated assault. (See, e.g., *People v. Armstrong*, *supra*, 8

Cal.App.4th at p. 1066; *People v. Roberts* (1981) 114 Cal.App.3d 960, 965.) In our view, however, the evidence was such that a reasonable jury was not *required* to find that Puterbaugh *actually exerted* the quantum of force necessary for aggravated assault. (Cf. *People v. Wyatt* (2012) 55 Cal.4th 694, 703-704; *People v. McDaniel*, *supra*, 159 Cal.App.4th at p. 749; see also *People v. Cook*, *supra*, 39 Cal.4th at p. 596.) There were discrepancies between Gilbert's testimony at trial, her testimony at the preliminary hearing, and what she told Clodt. Photographs taken inside the trailer did not inescapably support her claims. Moreover, although she opined Puterbaugh sometimes hit her as hard as he could, the nature of her injuries reasonably could have caused jurors to discount this testimony, particularly in light of Gilbert's additional testimony that Puterbaugh was training for mixed martial arts fighting and had black belts in several martial arts disciplines. In addition, Gilbert herself was not clear on what caused the approximately 14-hour period for which she had no memory. Although it was possible she was knocked out, she also testified she could have fallen asleep or passed out.[8]

Under the circumstances, this was not a situation in which the evidence was such that, if Puterbaugh was guilty at all, he necessarily was guilty of the greater offense. (See *People v. Berry* (1976) 18 Cal.3d 509, 519.) Jurors reasonably could have found that Puterbaugh assaulted Gilbert by means of force likely to produce great bodily injury. However, they also could have found Puterbaugh committed assault but, because they harbored a reasonable doubt as to the quantum of force used, concluded Puterbaugh committed only simple assault. This being the case, the trial court erred by failing to instruct on simple assault as a lesser-included offense, either on its own motion or when defense counsel requested that it do so.[9]

---

[8]During his summation, the prosecutor conceded Puterbaugh did not actually cause great bodily injury.

[9]We recognize that Puterbaugh took the position that none of Gilbert's testimony was true, and so he was not guilty of any crime. "A trial court's sua sponte duty to

In a noncapital case, a trial court's erroneous failure to instruct on a lesser-included offense is reviewed for prejudice under *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (*People v. Breverman*, *supra*, 19 Cal.4th at p. 178.) Under that standard, "[a] conviction of the charged offense may be reversed … only if, 'after an examination of the entire cause, including the evidence' [citation], it appears 'reasonably probable' the defendant would have obtained a more favorable outcome had the error not occurred [citation]." (*Ibid.*, fn. omitted; see *Watson*, *supra*, 46 Cal.2d at p. 836.) The requisite examination of the entire record includes "the facts and the instructions, the arguments of counsel, any communications from the jury during deliberations, and the entire verdict. [Citation.]" (*People v. Guiton* (1993) 4 Cal.4th 1116, 1130.)

Our examination of the record in the present case leads us to conclude the error was prejudicial under the foregoing standard. Gilbert had credibility problems. The People conceded she did not suffer great bodily injury. Evidence concerning the quantum of force used by Puterbaugh was not overwhelming. Significantly, the jury clearly struggled with the issue. Under the circumstances, it is reasonably probable Puterbaugh would have obtained a more favorable result had the jury been instructed on simple assault as to count 2.[10]

---

instruct on lesser[-]included offenses arises, however, not from the arguments of counsel but from the evidence at trial.… The trial court must instruct on lesser[-]included offenses when there is substantial evidence to support the instruction, regardless of the theories of the case proffered by the parties." (*People v. Barton*, *supra*, 12 Cal.4th at p. 203.) Although there may be situations in which the evidence itself forces jurors into an all-or-nothing choice, depending on which witness or witnesses they believe, this was not such a case. (Compare *People v. Elize* (1999) 71 Cal.App.4th 605, 610, 615-616, with *People v. Sinclair* (1998) 64 Cal.App.4th 1012, 1017-1020.)

[10]In *People v. Breverman*, *supra*, 19 Cal.4th at page 177, the California Supreme Court stated that posttrial review under *Watson* "focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration." The Attorney General seizes on this language to argue that the standard of prejudice focuses on a hypothetical reasonable jury; hence, the questions asked by *Puterbaugh's* jury during deliberations, and *this* jury's thought processes, are irrelevant

"Although [Puterbaugh]'s conviction[ on count 2] cannot stand, it does not necessarily follow that the judgment must be unconditionally reversed. 'An appellate court is not restricted to the remedies of affirming or reversing a judgment. Where the prejudicial error goes only to the degree of the offense for which the defendant was convicted, the appellate court may reduce the conviction to a lesser degree and affirm the judgment as modified, thereby obviating the necessity for a retrial. [Citations.]" (*People v. Edwards* (1985) 39 Cal.3d 107, 118.)

Here, Puterbaugh requested an instruction on simple assault, and, since the jury necessarily concluded Puterbaugh did indeed assault Gilbert, the record establishes Puterbaugh's guilt of that offense. Accordingly, Puterbaugh has consented to modification of the judgment on count 2. (See *People v. Edwards*, *supra*, 39 Cal.3d at p. 118.) The People, however, have expressed no view on the matter, and, because sufficient evidence supports the conviction of assault by means of force likely to produce great bodily injury, they are entitled to retry Puterbaugh on that charge if they so choose. Our disposition will preserve both options. (See *ibid.*)

---

in evaluating prejudice. *Breverman* makes it clear, however, that assessment of prejudice under *Watson*—even in the context of failure to instruct on a lesser-included offense—requires examination of the *entire* cause. (*Breverman*, *supra*, at p. 178.) Indeed, in rejecting the assertion that if a defendant were convicted of the charged offense on substantial evidence, any error in failing to instruct on a lesser-included offense must necessarily be harmless, the court explained: "[T]he very purpose of the rule is to allow the jurors to convict of either the greater or the lesser offense where the evidence might support either. That *the jury* chose the greater over acquittal, and that the evidence technically permits conviction of the greater, does not resolve the question whether, 'after an examination of the entire cause, including the evidence' [citation], it appears reasonably probable *the jury* would nonetheless have elected the lesser if given that choice. Depending on the circumstances of an individual case, such an examination may reveal a reasonable probability that the error affected the outcome in this way." (*Ibid.*, fn. 25, original italics omitted, italics added.) The high court obviously was taking into account the actions of the actual trial jury, much as other courts have done in applying *Watson*. (See, e.g., *People v. Dominguez* (2006) 39 Cal.4th 1141, 1160; *People v. Collins* (1968) 68 Cal.2d 319, 332-333; *People v. Fuentes* (1986) 183 Cal.App.3d 444, 456.)

## II. *Denial of new trial motion*

### A. *Background*

The cause was delivered to the jury for deliberation at 3:00 p.m. on October 17, and the jury returned its verdicts at 4:30 p.m. on October 18. After the guilty verdicts were read, the jury was polled. All jurors confirmed those were their personal verdicts.

The next day, jury services received an e-mail from Juror No. 5, which it forwarded to the court on October 21. In the message, the juror asked to speak with the court clerk or, preferably, the judge. She stated she was upset about the previous day's events and, by the end of deliberations, felt intimidated by the rest of the jury.

On October 24, the court received a letter dated October 23 from Juror No. 4. In it, she related the following issues she felt needed to be addressed:

(1) Several jurors did not want to hear Juror No. 4's opinion about the trial and testimonies. They wanted to use Gilbert's and the deputy's testimony, which did not match the evidence the jury was given, and said Juror No. 4 was speculating. Several jurors had already decided Puterbaugh was guilty.

(2) A few jurors wanted a transcript of Gilbert's testimony. The judge asked if they really needed the transcript because it would take several hours for the request to be fulfilled and the jurors would be deliberating that much longer. The foreperson and other jurors said no because they were getting tired and wanted to go home. Juror No. 4 felt Gilbert's testimony "was important to the case, but due to a few other jurors that didn't want to take more time to actually evaluate the situation thoroughly was unjust."

(3) Around 4:00 p.m., Juror No. 2 "stated that it was getting late, he was getting tired and he was f*****g missing work and was not f*****g coming back on Monday [and] that we need to end this." Juror No. 4 felt the attitude was unprofessional and lacked integrity. In addition, the foreperson had had a professional obligation the night before that prevented him from returning home until late. By the afternoon, he progressively became irate and did not want to hear anything that some of the other jurors

12.

had to say. Juror No. 4 had questions and issues that were "never answered or wanted to be discussed."

(4) The foreperson asked each juror his or her verdict. Juror No. 4 asked the foreperson not to give Puterbaugh a felony because of the lack of evidence. She asked the foreperson if he would consider a misdemeanor or even a not-guilty verdict. Juror No. 4 had questions and wanted to talk about them, but the other jurors and the foreperson were tired and wanted the case to be over so everyone could leave. The foreperson said Puterbaugh was guilty of "'Menacing,'" and so was guilty of a felony. When Juror No. 4 asked the foreperson to define "'Menacing'" as it related to the case, the foreperson informed the other jurors that Puterbaugh looked at his mother and said nothing to her, and that was menacing. Juror No. 4 felt the foreperson had already convicted Puterbaugh of a felony charge. The foreperson checked the "Felony" box and the jurors all headed out the door.

Juror No. 4 further asserted that, when the judge asked if she agreed to the verdict, she wanted to say no, but she felt intimidated and coerced into giving a guilty verdict. She felt the jury did Puterbaugh "a grave injustice."

After receipt of the two communications, the court met with counsel.[11] Defense counsel asked the court to investigate. The prosecutor asked the court to wait for any motions Puterbaugh might file. The court stated it had looked at the applicable law, and, if there had been actual physical intimidation or threats, the court would have an obligation to deal with them. On the other hand, it needed to "stay away" from mental stress or the mental processes of deliberations. The first communication referenced

---

[11]It appears the court may have met with counsel off the record after the first communication was received. The record on appeal does not contain any minute order or reporter's transcript of such a meeting; however, at one point, the prosecutor remarked, "If the Court is still inclined to proceed as it indicated on Monday, then—listing questions and areas of inquiries from the parties, then I do have that to submit to the Court and counsel …."

intimidation, but without defining the nature of it, and so the court was concerned whether it should conduct an inquiry on the subject. After receiving Juror No. 4's more specific communication, however, the court realized it was the jury's mental processes that were at issue. Accordingly, the court declined to proceed further, subject to any motions that might be filed, since the attorneys had enough information to determine whether motions were warranted.[12]

Puterbaugh subsequently moved for a new trial, based in part on a verdict decided by means of intimidating behavior and juror misconduct. Appended to the motion as exhibits were the October 19 e-mail from Juror No. 5, the October 23 letter from Juror No. 4, and a letter from Juror No. 5 dated October 31.

In her letter, Juror No. 5 stated she was still personally uncertain as to Puterbaugh's guilt or innocence, felt the verdict was invalid, and was rendered unable to deliberate properly by the atmosphere during deliberations. She explained that, throughout the trial and deliberations, she had "great doubt" regarding Puterbaugh's guilt or innocence. Initially, jurors interacted well; however, as Friday progressed, they became tired and the atmosphere "devolved." The rest of the jury appeared to have concluded Puterbaugh was guilty, and Juror No. 5 was the only one still vocally debating the issue. It became difficult for her to voice her opinion without being interrupted. Some jurors became angry with her for voicing her doubt and prolonging the deliberation. Some expressed frustration with her when she wanted to revisit the jury's tentative guilty verdict on the assault charge. It was late in the day on Friday, and those jurors were unwilling to extend the trial into the following week. When Juror No. 5 wanted to see the transcript of Gilbert's testimony, the judge estimated it could not be provided for at least two hours. The jurors decided it probably would not help Juror No. 5 make her decision so it was not worth the wait. Juror No. 5 was told that,

---

[12]Both communications contained the jurors' names and telephone number(s).

14.

regardless of what she decided, her time was up and she "must make a decision 'now.'" This bothered her "greatly" and she felt intimidated. In the end, she capitulated to the rest of the jury rather than holding her ground and insisting on taking more time.

Juror No. 5 further related that, after the jury had agreed on a verdict on both charges, Juror No. 4 began vocalizing that she was not comfortable with the felony convictions based on the evidence presented. By that point, however, the other jurors had started packing up their belongings, and simply responded that the decision had already been made. As the jury delivered the verdict, Juror No. 5 was still struggling with her doubt and did not want to go along with the rest of the jury. She was "paralyzed," however, and did not feel she had any other option. She was "incredibly distraught, visibly weeping." She did not want to return to the deliberation room and be "bombarded" by the rest of the jury. She regretted not being able to speak up when the jury was polled. She did not feel right about the verdict and felt it was invalid due to "incomplete deliberation." She believed it would be appropriate for the case to be retried.

The People opposed the motion. In large part, they asserted the defense's proffered evidence was barred by Evidence Code section 1150.

The trial court denied the motion. In part, it stated: "As to the [jurors who] said they were intimidated. The first one came in and said only that. The Court did start to proceed down a path to determine what was meant by the use of the word 'intimidation,' and before we got there, the second juror came in with a detailed breakdown of what she meant by the word 'intimidation.' [¶] At that point in time, I felt both attorneys had a complete record of what was being alleged in the jury room, and those—information was turned over to both sides, and no motions were filed based on anything that came up with that after you were given the opportunity to follow up on what occurred. Clearly on the second letter, everything that was identified is appropriate for [jurors'] deliberations."

Puterbaugh now says the trial court erred. We conclude the trial court correctly refused to order a new trial based on juror misconduct.

15.

### B. Analysis

"When a verdict has been rendered … against the defendant, the court may, upon his application, grant a new trial …:  [¶] … [¶]  3. When the jury has … been guilty of any misconduct by which a fair and due consideration of the case has been prevented; [¶] 4. When the verdict has been decided … by any means other than a fair expression of opinion on the part of all the jurors .…"  (§ 1181.)

"The trial court is vested with broad discretion to act upon a motion for new trial. [Citation.]"  (*People v. Dykes* (2009) 46 Cal.4th 731, 809.)  Thus, generally speaking, ""[a] trial court's ruling on a motion for new trial is so completely within that court's discretion that a reviewing court will not disturb the ruling absent a manifest and unmistakable abuse of that discretion.""  [Citations.]"  (*People v. Thompson* (2010) 49 Cal.4th 79, 140.)  When the motion is based on jury misconduct, however, the reviewing court accepts the trial court's factual findings and credibility determinations if they are supported by substantial evidence.  (*Dykes*, *supra*, at p. 809.)  Where the historical facts are essentially undisputed, the inquiry whether those facts constitute misconduct is "a legal question we review independently."  (*People v. Collins* (2010) 49 Cal.4th 175, 242, fn. omitted.)  We exercise our independent judgment to determine whether any misconduct was prejudicial.  (*Dykes*, *supra*, at p. 809.)

In determining whether the trial court erred, we must first determine to what extent, if any, the juror communications proffered by Puterbaugh in support of the motion were admissible.  (See *People v. Duran* (1996) 50 Cal.App.4th 103, 112.)  As the California Supreme Court has explained:

> "Evidence Code section 1150, subdivision (a), provides:  'Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly.  *No evidence is admissible* to show the effect of such statement, conduct, condition, or event upon a juror either

in influencing him to assent or to dissent from the verdict or *concerning the mental processes by which it was determined*.' (Italics added.)

"This statute distinguishes 'between proof of overt acts, objectively ascertainable, and proof of the subjective reasoning processes of the individual juror, which can be neither corroborated nor disproved ....' [Citation.] 'This limitation prevents one juror from upsetting a verdict of the whole jury by impugning his own or his fellow jurors' mental processes or reasons for assent or dissent. The only improper influences that may be proved under [Evidence Code] section 1150 to impeach a verdict, therefore, are those open to sight, hearing, and the other senses and thus subject to corroboration.' [Citations.]" (*People v. Steele* (2002) 27 Cal.4th 1230, 1260-1261.)

Statements are among the overt acts admissible under Evidence Code section 1150, subdivision (a). (*In re Stankewitz* (1985) 40 Cal.3d 391, 398; *People v. Engstrom* (2011) 201 Cal.App.4th 174, 184.) Even when such evidence may be received, however, "it must be admitted with caution." (*Stankewitz*, *supra*, at p. 398.) Our state high court has "emphasize[d] that, when considering evidence regarding the jurors' deliberations, a trial court must take great care not to overstep the boundaries set forth in Evidence Code section 1150. The statute may be violated not only by the admission of jurors' testimony describing their own mental processes, but also by permitting testimony concerning statements made by jurors in the course of their deliberations." (*People v. Hedgecock* (1990) 51 Cal.3d 395, 418-419.) "Statements have a greater tendency than nonverbal acts to implicate the reasoning processes of jurors—e.g., what the juror making the statement meant and what the juror hearing it understood." (*Stankewitz*, *supra*, at p. 398.) "In rare circumstances a statement by a juror during deliberations may itself be an act of misconduct, in which case evidence of that statement is admissible. [Citation.] But when a juror in the course of deliberations gives the reasons for his or her vote, the words are simply a verbal reflection of the juror's mental processes. Consideration of such a statement as evidence of those processes is barred by Evidence Code section 1150." (*Hedgecock*, *supra*, at p. 419.)

17.

Before examining the juror communications themselves, we address two preliminary matters.

First, we question whether the juror communications constituted competent evidence of *anything*, even setting aside for the moment the strictures of Evidence Code section 1150. They contained hearsay and, more importantly, were unsworn.[13] Although, as Puterbaugh points out, the prosecutor did not object on either ground, the California Supreme Court has referred to such evidence in the context of a motion for a new trial based on alleged jury misconduct as "insufficient" (*People v. Manibusan* (2013) 58 Cal.4th 40, 55) and "no[t] competent" (*People v. Cox* (1991) 53 Cal.3d 618, 697, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22). Courts of Appeal have reached differing conclusions as to whether such evidence is properly considered if the People do not object. (Compare *People v. Engstrom*, *supra*, 201 Cal.App.4th at p. 184 with *People v. Vallejo* (2013) 214 Cal.App.4th 1033, 1043; *People v. Bryant* (2011) 191 Cal.App.4th 1457, 1470-1471.) Because the trial court and parties treated them as competent proof, we will assume without deciding that they were properly before the court. We will, however, limit our consideration to the portions that are admissible under Evidence Code section 1150. (See *People v. Collins*, *supra*, 49 Cal.4th at p. 250.)

Second, we conclude the trial court was not required to conduct an investigation upon receipt of the first communication, nor was it required to hold an evidentiary hearing on the misconduct issue. "Whether and how to investigate an allegation of juror misconduct falls within the court's discretion. [Citation.]" (*People v. Allen* (2011) 53 Cal.4th 60, 69.) During trial, a duty to investigate arises "'whenever the court is put on

---

[13]We have no idea why defense counsel did not submit sworn declarations. She clearly had the information necessary to contact Juror Nos. 4 and 5, and the fact the trial court declined to undertake any investigation certainly did not prevent her from doing so. (See Code Civ. Proc., § 206, subd. (b).)

notice that good cause to discharge a juror may exist.'" (*People v. Jenkins* (2000) 22 Cal.4th 900, 985.) In such instances, the court must conduct a hearing that is sufficient under the circumstances to determine the facts. (*People v. Burgener* (1986) 41 Cal.3d 505, 519-520, disapproved on another ground in *People v. Reyes* (1998) 19 Cal.4th 743, 756.) Here, of course, the allegations arose postverdict, not during trial. Even assuming a scenario could exist in which a trial court would be required to investigate at that juncture, under the circumstances in the present case, the trial court did not abuse its discretion by leaving any investigation to the parties.

Whether to hold an evidentiary hearing also falls within a trial court's discretion. (*People v. Avila* (2006) 38 Cal.4th 491, 604.) Here, there were no material, disputed issues of fact to be resolved, nor, as we discuss in greater detail below, did the defense come forward with evidence demonstrating a strong possibility prejudicial misconduct occurred. Accordingly, Puterbaugh was not entitled to such a hearing. (*People v. Hedgecock*, *supra*, 51 Cal.3d at pp. 415-416, 419.)

We now examine the juror communications themselves. For the most part, they ran afoul of Evidence Code section 1150, subdivision (a), and so were inadmissible. "'"'[A] verdict may not be impeached by inquiry into the juror's mental or subjective reasoning processes, and evidence of what the juror 'felt' or how he [or she] understood the trial court's instructions is not competent."'" [Citations.]" (*People v. Lindberg* (2008) 45 Cal.4th 1, 53; accord, *People v. Steele*, *supra*, 27 Cal.4th at p. 1261.) "The mere fact that such mental process was manifested in conversation between jurors during deliberations does not alter this rule. [Citation.]" (*People v. Sanchez* (1998) 62 Cal.App.4th 460, 476.) Similarly, the reasons Juror Nos. 4 and 5 voted guilty were "demonstrative only of [their] mental processes and the subjective considerations which influenced [their] verdict[s]," and were also inadmissible. (*People v. Peavey* (1981) 126 Cal.App.3d 44, 51; see *People v. Romero* (1982) 31 Cal.3d 685, 694; *Bandana Trading Co., Inc. v. Quality Infusion Care, Inc.* (2008) 164 Cal.App.4th 1440, 1446.)

The entirety of Juror No. 5's initial e-mail was inadmissible under Evidence Code section 1150. Portions of her October 31 letter and Juror No. 4's October 23 letter did set out objectively ascertainable overt acts, however, and so were not barred by the statute.[14] We must determine whether any of those overt acts constituted misconduct.

An accused has a constitutional right to a trial by an impartial jury—one in which no member has been improperly influenced and each member is capable of, and willing to, decide the case solely on the evidence before it. (*In re Hamilton* (1999) 20 Cal.4th 273, 293-294.) "However, with narrow exceptions, evidence that the internal thought processes of one or more jurors were biased is not admissible to impeach a verdict." (*Id.* at p. 294.) Rather, a juror generally commits misconduct "[w]hen the overt event is a direct violation of the oaths, duties, and admonitions imposed on actual or prospective jurors, such as when a juror conceals bias on voir dire, consciously receives outside information, discusses the case with nonjurors, or shares improper information with other jurors .… [Citations.]" (*Ibid.*)

"Misconduct by a juror … usually raises a rebuttable 'presumption' of prejudice. [Citations.]" (*In re Hamilton*, *supra*, 20 Cal.4th at p. 295.) It is important to keep in mind, however, that "[t]he jury system is fundamentally human, which is both a strength and a weakness. [Citation.] Jurors are not automatons. They are imbued with human frailties as well as virtues. If the system is to function at all, we must tolerate a certain amount of imperfection short of actual bias. To demand theoretical perfection from every

---

[14]These include, but are not necessarily limited to, Juror No. 4's recitation of Juror No. 2's using profanity, stating he was missing work and not coming back on Monday, and that they needed to end this; Juror No. 4's recitation that the foreperson checked the "Felony" box and they all "headed out the door"; Juror No. 5's recitation of being told that, regardless of what she decided, her time was up and she had to make a decision "'now'"; and Juror No. 5's recitation that the other jurors started packing up their things and said the decision had already been made.

juror during the course of a trial is unrealistic." (*In re Carpenter* (1995) 9 Cal.4th 634, 654-655; see *People v. Danks* (2004) 32 Cal.4th 269, 302-303.)

The admissible portions of the juror communications fail to demonstrate misconduct.

First, there was no improper prejudgment or refusal to deliberate. "Prejudgment 'constitute[s] serious misconduct' [citation]" (*People v. Weatherton* (2014) 59 Cal.4th 589, 598), as does a refusal to deliberate (*People v. Leonard* (2007) 40 Cal.4th 1370, 1410). "A refusal to deliberate consists of a juror's unwillingness to engage in the deliberative process; that is, he or she will not participate in discussions with fellow jurors by listening to their views and by expressing his or her own views. Examples of refusal to deliberate include, but are not limited to, expressing a fixed conclusion at the beginning of deliberations and refusing to consider other points of view, refusing to speak to other jurors, and attempting to separate oneself physically from the remainder of the jury." (*People v. Cleveland* (2001) 25 Cal.4th 466, 485.) Where a juror has participated in deliberations for a reasonable period of time, however, he or she has not refused to deliberate "simply because the juror expresses the belief that further discussion will not alter his or her views. [Citation.]" (*Ibid.*)

Both juror letters in the present case amply demonstrated deliberations occurred. (See *People v. Thompson*, *supra*, 49 Cal.4th at pp. 140-141.) Some jurors simply made up their minds earlier than others. It was not misconduct for them to express a desire to end deliberations. (See, e.g., *People v. Vallejo*, *supra*, 214 Cal.App.4th at p. 1043.) That being so, telling Juror No. 5 she had to make a decision "'now'" could only potentially be misconduct if the effect on Juror No. 5 were taken into consideration, but such evidence was inadmissible. (*People v. Lewis* (2001) 26 Cal.4th 334, 388-389; see *People v. Manibusan*, *supra*, 58 Cal.4th at p. 55.)

Juror No. 4's recitation of the foreperson checking the "Felony" box did not establish misconduct on the foreperson's part: When the jury was polled, Juror No. 4

affirmed her verdicts. Her reasons for doing so, as stated in her letter, were inadmissible. Similarly, Juror No. 5's recitation of jurors packing up their things and stating the decision had already been made did not demonstrate misconduct; the letter itself demonstrated the jurors had already agreed on guilty verdicts on both charges.

Finally, Juror No. 2's statement, as well as anger and frustration expressed by various jurors, did not rise to the level of misconduct. (Compare *In re Stankewitz, supra*, 40 Cal.3d at p. 396 [juror who was police officer committed misconduct by stating his knowledge of the law and when robbery occurs] with *People v. Thompson, supra*, 49 Cal.4th at pp. 139, 141 [no misconduct where jurors asked another juror how she could be so dumb, and stated defendant's guilt was "as plain as day" and they needed to leave and were not going to keep coming back to go over same things again]; *People v. Keenan* (1988) 46 Cal.3d 478, 541-542 [outburst by one juror against another, in which first juror threatened second juror, was "particularly harsh and inappropriate," but did not impeach verdict because it was "but an expression of frustration, temper, and strong conviction against the contrary views of another panelist"]; *People v. Orchard* (1971) 17 Cal.App.3d 568, 572-574 [conduct of foreperson, in angrily chastising jurors for 10 to 15 minutes for not keeping open minds, was not of such character as was likely to have influenced jury improperly; no evidence was admissible to show effect of such conduct and/or statements upon other jurors].) "'[J]urors can be expected to disagree, even vehemently, and to attempt to persuade disagreeing fellow jurors by strenuous and sometimes heated means.' [Citation.]" (*Thompson, supra*, at p. 141.) That Juror Nos. 4 and 5 may have felt intimidated and coerced does not enter into our consideration. (Evid. Code, § 1150, subd. (a).)

Puterbaugh cites *People v. Crowley* (1950) 101 Cal.App.2d 71 (*Crowley*), but it does not assist him. In that case, the comments of the *trial court*—not a juror—were found prejudicial where the court told jurors who were having trouble reaching a verdict that the evidence was clear although conflicting; it should be analyzed to the extent of

22.

being able to reach a decision in the case; and the jurors should reach a verdict if at all possible. Approximately 30 minutes later, the jury rendered a guilty verdict. (*Id*. at pp. 75-76.) The appellate court found "added force" was given to the trial court's statements by the fact jurors were allowed only half an hour to reach a verdict before they were locked up for the night. (*Id*. at p. 78.) The Court of Appeal explained: "The fixing of so short a time after the reported disagreement was of itself a form of compulsion …. The dissenting jurors, if they did not agree with the others in half an hour, would have been responsible not only for their own detention overnight but also for the detention of the other jurors. And we think it would require unusual stamina in one or more dissenting jurors to hold to their minority views against the remainder, who would naturally be somewhat rebellious at the thought of being locked up for the night at 5 o'clock. This phase of the proceedings … emphasized the pressure which the court's remarks placed upon the minority of the jurors. Clearly these were the ones who had previously deemed the evidence of guilt to be unsatisfactory. We cannot say that they voluntarily changed their opinions." (*Id*. at pp. 78-79.)

*Crowley* dealt with statements and a threat of detention made by a trial court, not a desire expressed by jurors in the jury room not to have to come back another day.[15] There is a great difference between the two. (See *People v. Orchard*, *supra*, 17 Cal.App.3d at pp. 573-574.)

### DISPOSITION

The conviction on count 3 is affirmed. The conviction on count 2 is reversed. If the People do not bring Puterbaugh to trial on count 2 within 60 days after the filing of the remittitur in the trial court, the trial court shall proceed as if the remittitur constituted

---

[15]Contrary to Puterbaugh's assertion, Juror No. 2's stated refusal to return after the weekend imposed no "arbitrary deadline" on deliberations. If he did not return, he—not the other jurors—would have been the one to suffer the consequences.

23.

a modification of the judgment to reflect a conviction as to count 2 of simple assault (§ 240) and shall resentence Puterbaugh accordingly.

_____
                                                                                        Smith, J.

WE CONCUR:


_____
Gomes, Acting P.J.


_____
Peña, J.

24.